FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 MAR 25  PM 4:09

U.S. DISTRICT COURT
N.D. OF ALABAMA

KAREN DOLORES KLASSEN,       )
                             )
         Plaintiff,          )
                             )
vs.                          )    Case No. CV-97-TMP-2047-S
                             )
CITY OF HOOVER, ALABAMA;     )
KEITH E. HARMON; and         )
EDDIE MORRISSETTE,           )    **ENTERED**
                             )
         Defendants.         )    MAR 25 1999

MEMORANDUM OPINION

This cause is before the court[1] on the motion for summary
judgment filed by the defendants, City of Hoover, Alabama, and
Hoover Police Officers Keith E. Harmon and Eddie Morrissette, filed
June 25, 1998. Plaintiff responded to the motion with a brief and
exhibits supporting her claims, and the motion is now under
submission.

Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment
is proper "if the pleadings, depositions, answers to

---

[1] On August 7, 1998, the parties jointly consented to the
exercise of full, dispositive jurisdiction by the undersigned
magistrate judge pursuant to 28 U.S.C. § 636(c).

1

30

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there

2

is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ.
P. 56(e)). The nonmoving party need not present evidence in a form
necessary for admission at trial; however, she may not merely rest
on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language
of Rule 56(c) mandates the entry of summary judgment, after
adequate time for discovery and upon motion, against a party who
fails to make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party
will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion
for summary judgment, the court must grant the motion if there is
no genuine issue of material fact, and the moving party is entitled
to judgment as a matter of law. Fed. R. Civ. P. 56(c). The
substantive law will identify which facts are material and which
are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986). A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Id. at 248. "[T]he judge's function is not himself to weigh the
evidence and determine the truth of the matter but to determine
whether there is a genuine issue for trial." Id. at 249. His guide
is the same standard necessary to direct a verdict: "whether the
evidence presents a sufficient disagreement to require submission

3

to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

4

## Undisputed Facts

Applying these standards to the evidence before the court, the following facts appear to be undisputed or, if disputed, taken in a light most favorable to the plaintiff.

At the time of the acts made the basis of this action in August 1995, plaintiff was a 62-year old woman weighing 104 pounds. She suffered from osteoporosis, rheumatoid arthritis, and an atrophied right hand. She had been receiving disability benefits from the Social Security Administration for several years. She had no known history of criminal activity or threatening behavior.

On August 8, 1995, plaintiff was trimming dead flowers in her yard in preparation for a visit the next day from the Alabama Historical Society. Her home fronts on Shades Crest Road, a very heavily traveled street, with Mimosa Lane running to one side of her home. Mimosa Lane is a very narrow street. While working in her yard, she noticed a large truck, described as an 18-wheel tractor-trailer, trying to move up Mimosa Lane to turn onto Shades Crest. The driver of the truck got out and walked up Mimosa Lane to try to determine how he could make the turn. Plaintiff told the driver that Mimosa was too narrow to make the turn without running over her property and damaging her flowers, and she advised him to back up to the other end of Mimosa Lane. She and the driver walked

5

back to the truck, and she offered to help guide him as he attempted to back the large rig. Rather that backing up, however, the driver moved forward, apparently intending to continue up Mimosa Lane and make the turn onto Shades Crest. Plaintiff then blocked his path by standing in front of the truck.

The stand-off continued until two Hoover police officers arrived in separate patrol cars. Officers Harmon and Morrissette had been dispatched to the scene. They found plaintiff standing in the middle of Mimosa Lane, in front of the truck, garden shears in one hand and a bundle of dead flowers in the other. Plaintiff refused several demands by the officers to move and allow the truck to proceed. She pointed out to the officers that the truck would not be able to make the turn onto Shades Crest without damaging her property.

The confrontation escalated as plaintiff refused the orders of the officers to move. She admits that she raised her voice at the officers. Ultimately, one of the officer said, "We've heard enough from you. You're under arrest." When they told plaintiff to put down the garden shears, which she forgot was in her hand, she replied quizzically, "What?" She never raised the shears or was otherwise threatening with them. At that point the officers rushed her, grabbing both arms and twisting them behind her back to

6

handcuff her.  She told the officers not to twist her arms because she had a disability, but they only twisted harder.  Plaintiff wrestled to escape their grasp, but the officers "dragged" her to one of the patrol cars, during which her foot became caught in a pothole, causing pain in her knee.  When they got to the patrol car, the officers placed her face down on the hood with her hands cuffed behind.  As she tried to lift her head, one of the officers placed his hand on the back of her head and pushed her face into the hood of the car with such force that both front teeth were broken.  They then "threw" her face down into the back seat of the patrol car to take her to jail.

At the police station, the officers asked her if she would get out of the car voluntarily or would they have to "take her out." She replied that because they had injured her, they would have to get her out of the car.  She was then pulled from the car and carried by several officers into police headquarters.  Inside, she was "dropped" to the floor face first in front of the police desk. There, officers laughed at her and ridiculed her.  Eventually, another officer came in and escorted her to a cell where he gave her some dry clothing to put on.

Plaintiff complained about injuries for several hours.  Hoover paramedics were called to check on her, but she refused medical

7

treatment, even signing a statement that she refused to be treated by them.   The paramedics noted that her right wrist and knee were swollen and that she had a "chipped" tooth.

She remained in the Hoover City Jail that night and most of the next day until being released at about 7:00 P.M. on August 9, 1995.   She went immediately to Brookwood Hospital, where she was diagnosed with a fractured right wrist and a fractured right knee.[2] The broken wrist was treated initially with a long arm cast, which eventually was cut down to a short arm cast due to irritation of skin by the cast.  She was given a leg immobilizer, a kind of brace that prevented movement of the knee, to wear on her right leg.  She declined further diagnostic tests, including a CT scan or an MRI, to determine the precise extent of injury to her knee.  Several months later, she had crowns put on her broken teeth.

When plaintiff returned home, she found extensive damage to her lawn and flower beds where the tractor-trailer apparently crossed her property making the turn onto Shades Crest after she was arrested.   Traffic signs were knocked down, and shrubs and decorative   rock   and   wrought-iron   railing   were   destroyed.

---

[2]      Precisely, she was diagnosed with a hairline fracture of the right lateral tibial plateau "which appears to be stable." (Plaintiff's Ex. D).

8

Additionally, she was charged with disorderly conduct and later convicted of that offense in the Hoover Municipal Court. She has appealed the conviction *de novo* to the Circuit Court of Jefferson County, Alabama, where the case remains awaiting a jury trial.[3]

## Discussion

Plaintiff's complaint alleges a simple cause of action under 42 U.S.C. § 1983 for violation of her Fourth Amendment right to be free from the use of excessive force by the arresting police officers. It is, perhaps, significant to note that she does not allege a separate claim under the Fourth Amendment for an arrest without probable cause, but only a claim dealing with the degree of force used to make the arrest. Not stated as explicitly in the complaint is an apparent claim also for denial of necessary medical treatment in violation of the Fourteenth Amendment. Also, the complaint does not plead any state-law claims such as assault and battery, false arrest, or outrage.

Named as defendants are the arresting officers Harmon and Morrissette, who are sued both in their individual and official capacities, and their employer, the City of Hoover ("Hoover"). On

---

[3]     Under Alabama law, an appeal *de novo* to circuit court automatically vacates the lower court conviction.

9

the latter claim, the complaint alleges only that the city "approved and ratified the actions of the Hoover Police Department, which was free, without cause, to physically injure the plaintiff, make a public spectacle of the plaintiff and without medical treatment to the plaintiff for at least twenty-four hours."

In answer to the complaint, the arresting officers assert that they did not use unnecessary physical force to effect plaintiff's arrest because she was threatening them with the garden shears she held, and that they are entitled to qualified immunity. While it is unclear whether they were involved in the alleged refusal of medical treatment, they assert, nonetheless, that they did not deny her any medical treatment and that, indeed, paramedics were summoned to assist the plaintiff but that she refused to be treated by them. The City of Hoover responds to the complaint by asserting that it cannot be held liable for the actions of the officers simply on the basis of *respondeat superior* and that it has no policy, practice, or custom that proximately caused any violation of the plaintiff's federal constitutional rights.

## I. Claims Against City

Hoover's motion for summary judgment points out correctly that it cannot be held liable in this case simply because it was the

10

employer of officers Harmon and Morrissette.   Liability under

§ 1983 cannot be predicated merely on *respondeat superior*.   <u>Monell</u>

<u>v. Department of Social Services</u>, 436 U.S. 658, 98 S.Ct. 2018, 56

L.Ed. 2d 611 (1978); <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350

(11th Cir. 1998).   As the court of appeals has explained recently;

> The Supreme Court has placed strict
> limitations on municipal liability under
> section 1983. There is no respondeat superior
> liability making a municipality liable for the
> wrongful actions of its police officers in
> making a false arrest.   See *Monell v.
> Department of Social Servs.*, 436 U.S. 658,
> 691, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978).
> Instead, a municipality may be held liable for
> the actions of a police officer only when
> municipal "official policy" causes a
> constitutional violation.   See *id.* at 694-95,
> 98 S.Ct. 2018. [A plaintiff] must "identify a
> municipal 'policy' or 'custom' that caused
> [his] injury," *Board of County Comm'rs v.
> Brown*, 520 U.S. 397, 137 L.Ed. 2d 626, 117
> S.Ct. 1382, 1388 (1997)(citing *Monell*, 436
> U.S. at 694, 98 S.Ct. 2018); "It is only when
> the 'execution of the government's policy or
> custom... inflicts the injury' that the
> municipality may be held liable under § 1983."
> *City of Canton v. Harris*, 489 U.S. 378, 385,
> 109 S.Ct. 1197, 103 L.Ed. 2d 412 (1989).
>
> Thus, the City is not automatically liable
> under section 1983 even if it inadequately
> trained or supervised its police officers and
> those officers violated [plaintiff's]
> constitutional rights. Instead, the Supreme
> Court has explained that there are only
> "limited circumstances" in which an allegation
> of a failure to train or supervise can be the

11

basis for liability under § 1983. See *City of Canton*, 489 U.S. at 387, 109 S.Ct. 1197. The Supreme Court has instructed that these "limited circumstances" occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights. *Id.* at 389-91, 109 S.Ct. 1197; see also *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1555 (11th Cir.1989); *Brown*, 520 U.S. at ___, ___, 117 S.Ct. at 1388, 1390.

Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, the Supreme Court has further explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a "deliberate indifference" to the rights of its inhabitants, as follows:

We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition ... that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.... "Municipal liability under § 1983 attaches where - and only where - a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. Only

12

where a failure to train reflects a
"deliberate" or "conscious" choice by a
municipality - a "policy" as defined by our
prior cases - can a city be liable for such a
failure under § 1983.

*City of Canton*, 489 U.S. at 388-89, 109 S.Ct.
1197 (internal citations omitted).

To establish a "deliberate or conscious
choice" or such "deliberate indifference," a
plaintiff must present some evidence that the
municipality knew of a need to train and/or
supervise in a particular area and the
municipality made a deliberate choice not to
take any action. See *Board of County Comm'rs
v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1390-
91, 137 L.Ed. 2d 626 (1997); *Young v. City of
Augusta, Georgia*, 59 F.3d 1160, 1171-72 (11th
Cir.1995); *Church v. City of Huntsville*, 30
F.3d 1332, 1342-46 (11th Cir.1994); *Wright v.
Sheppard*, 919 F.2d 665, 674 (11th Cir.1990);
*Kerr v. City of West Palm Beach*, 875 F.2d
1546, 1556-57 (11th Cir.1989). This Court
repeatedly has held that without notice of a
need to train or supervise in a particular
area, a municipality is not liable as a matter
of law for any failure to train and supervise.
For example, in *Wright v. Sheppard*, 919 F.2d
665 (11th Cir.1990), this Court held that a
sheriff's department was not liable for a
deputy's acts when "no evidence of a history
of widespread prior abuse ... put the sheriff
on notice of the need for improved training or
supervision." Id. at 674. Indeed, in *Church
v. City of Huntsville*, 30 F.3d 1332 (11th
Cir.1994), this Court reversed a district
court's preliminary injunction against the
City of Huntsville, holding that the
plaintiffs were not likely to succeed on the
merits of their failure-to-train claim without
proof that the City was aware of a prior
incident in which constitutional rights were

> similarly violated. *Id*. at 1342-46. See also
> *Popham v. City of Talladega*, 908 F.2d 1561,
> 1564-65 (11th Cir.1990) (finding no liability
> for failure to train when no pattern of
> incidents put the City on notice of a need to
> train). More importantly, in *Brooks v.
> Scheib*, 813 F.2d 1191 (11th Cir.1987), even
> though there had been ten citizen complaints
> about police officer Scheib, this Court held
> that the City did not have any notice of past
> police misconduct because the plaintiff "never
> demonstrated that past complaints of police
> misconduct had any merit." *Id*. at 1193. This
> Court aptly noted, "Indeed, the number of
> complaints bears no relation to their
> validity." *Id*.

Gold v. City of Miami, 151 F.3d 1346, 1349-1351 (11th Cir. 1998).

In the instant case, plaintiff alleges only that Hoover "approved of and ratified" the specific acts of these officers against this plaintiff. The complaint does not allege that Hoover had an official policy or custom of approving the use of excessive police force to effect arrests. Indeed, the complaint does not allege that Hoover was on notice of wide-spread or repeated uses of excessive force by its officers that might create a duty on its part to provide better training or supervision. Plaintiff's brief in opposition to the City's motion for summary judgment argues only that the City is not shielded by qualified immunity (which is true, but beside the point) and is liable for the "continuous course of

14

conduct displayed in the case at hand ...." Plaintiff simply has failed to carry her burden of producing evidence from which a reasonable jury might find that an official policy, custom, or practice of the City of Hoover was a motivating force behind either the manner in which plaintiff was handled during the arrest or the failure to provide medical attention to her after the arrest.

Similarly, plaintiff's Fourteenth Amendment claim for denial of medical care fails against Hoover. There is no evidence that the City of Hoover had either an affirmative policy of denying medical attention to arrestees or of failing to have a policy of providing medical attention for ill or injured jail inmates. Absent some evidence that Hoover's official policies, practices, or customs were the motivating force behind the alleged denial of treatment, the City cannot be held liable. It is not enough merely that the City's employees might have failed to provide medical attention. Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct 2018, 56 L.Ed. 2d 611 (1978).[4]

In addition to suing Hoover directly in its own name, plaintiff also has sued Officers Harmon and Morrissette in their

---

[4]     Alternatively, as noted later in this opinion, plaintiff was not denied medical attention. Paramedics were called to assist her, but she refused to be examined by them.

15

*official* capacities. This claim against them in their official capacities is simply another way of joining the City as a defendant, see Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct 2018, 56 L.Ed. 2d 611 (1978); Hobbs v. Roberts, 999 F.2d 1526, 1530 (11th Cir. 1993)("The Supreme Court has said that official capacity suits represent 'only another way of pleading an action against an entity of which an officer is an agent,' and a victory against a named individual in an official capacity suit is 'a victory against the entity that employs him.'").

Naming Harmon and Morrissette in their official capacities, however, does not make Hoover liable for their acts simply by virtue of the employment relationship. Rather, even when an officer is named in his official capacity, the plaintiff can prevail only by showing the requisite link between the acts complained of and some official policy or practice of governmental entity itself. As the Supreme Court observed in Hafer v. Melo, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed. 2d 301 (1991), "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, **'the entity's "policy or custom" must have played a part in the violation of federal law.'"** Id. at

16

25 (quoting Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).  In this case, as explained above, there has been no showing by plaintiff that the acts complained of here were the product of an official policy, practice, or custom of the City of Hoover itself.  Thus, even though Harmon and Morrissette are sued in their official capacities, Hoover's motion for summary judgment still should be granted.

## II.   Claims Against Officers Harmon and Morrissette

Hoover Police Officers Harmon and Morrissette also are sued in their individually capacities.  In response to the complaint, Harmon and Morrissette argue that the facts simply do not demonstrate that they used excessive force against plaintiff or denied her any needed medical attention. Alternatively, they claim the shield of qualified immunity.  The court is persuaded that both of these arguments are unavailing.

To establish a claim for use of excessive force in violation of the Fourth Amendment, plaintiff is required to present evidence that would warrant a reasonable jury concluding that the force used against her to effect the arrest was "objectively unreasonable" -- that is, "a reasonable officer in the same situation would have believed that the force used was not excessive."  Thornton v. City

17

of Macon, 132 F.3d 1395, 1400 (11ᵗʰ Cir. 1998). "Whether the force used is reasonable turns on 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed. 2d 443 (1989)); see Smith v. Mattox, 127 F.3d 1416 (11ᵗʰ Cir. 1997).

The version of the facts offered by plaintiff establishes the objective unreasonableness of the force used to subdue plaintiff. While the defendants disagree with her description of the events, this does nothing more than prove the existence of genuine issues of fact that preclude summary judgment. The facts and circumstances, taken most favorably for plaintiff, reveals that Officers Harmon and Morrissette were faced with a small, elderly, and disabled woman, stooped by osteoporosis and arthritis, standing in the middle of Mimosa Lane to prevent a truck from doing damage to her property. She was not engaged in or suspected of a serious crime. While the defendants contend that she posed a threat to them because she refused to put down her garden shears, the evidence does not show that she threatened anyone. She denies that she raised the shears in a threatening manner, as defendants

18

contend, and there is no evidence that she verbally threatened to use the shears as a weapon. There is no evidence that she was mentally unstable, although she clearly was upset with the refusal of the officers to assist her to prevent imminent damage to her lawn and flowers. A reasonable officer simply would not perceive her to be a threat to do serious bodily injury.

After the officers rushed her and grabbed her arms, she did indeed wrestle to escape because she was afraid and wanted to get away from them. She told the officers not to twist her arms behind her because she was disabled. Despite that request, they twisted her arms even harder, apparently fracturing her right wrist. They then "dragged" her to the patrol car. If all of this did not exhibit unnecessary force, there simply is no excuse for what happened next. After she was restrained by two police officers and "braced" against the hood of a patrol car, one of the officers pushed her head into the hood with such force that her two front teeth were broken. These facts, if accepted by a jury, would warrant a finding of a violation of the Fourth Amendment.

The court also is persuaded that qualified immunity does not shield them from liability. Qualified immunity ordinarily shields public officials from monetary liability for acts within their discretionary authority unless the law was so clearly established

19

at the time that it was apparent to any reasonable officer that what they were doing was illegal in the circumstances. <u>Lassiter v. Alabama A&M University Board of Trustees</u>, 28 F.3d 1146 (11th Cir. 1994) (en banc). The law must be developed in a concrete, detailed way so as to put public officials on notice that their acts are a violation of federal constitutional law.

This case is comparable to <u>Smith v. Mattox</u>, 127 F.3d 1416 (11th Cir. 1997), and <u>Sheth v. Webster</u>, 145 F.3d 1231 (11th Cir. 1998), in which non-threatening persons were injured by police effecting an arrest with unnecessary force. <u>See, also,</u> <u>Thornton v. City of Macon</u>, 132 F.3d 1395, 1400 (11th Cir. 1998). In <u>Smith</u>, a suspect who had initially threatened an officer with a baseball bat surrendered to a pursuing officer. The officer then broke the suspect's arm while he lay face down being handcuffed. Even though the initial use of force was warranted by the threatening act of the suspect, once he submitted to authority and ceased to resist, the need for the use of force and the degree of force proper under the circumstances diminished greatly. Similarly, in <u>Steth</u>, an officer slammed a non-threatening female motel owner into a vending machine while arresting her without cause. The events in both of

these cases occurred in 1994,[5] predating the arrest in this case in August 1995, yet the court of appeals concluded that the law under Graham v. Connor was sufficiently well-established then that neither of the officers involved in those cases could claim the benefit of qualified immunity. It must follow, of course, that if the law was clearly established in 1994 for purposes of Smith and Steth, it was also clearly established in 1995, when this case arose.

Even if it can be argued that the officers were justified in the use of force to initially gain control of the plaintiff and, perhaps, even to move her to the patrol car, there seems no justification for smashing her face into the hood of the patrol car. While the court recognizes that the defendants deny that this occurred, the facts presented by the plaintiff, viewed favorably to her, warrant that conclusion for purposes of deciding this motion. Assuming that fact, that after being subdued and braced against the car, her face was smashed into the hood of the patrol car with sufficient force to break her front teeth, no reasonable officer

---

[5]     Although the reported opinion in Smith does not reveal the date of the events in that case, the court notes that the district court case had a "94" case number, indicating that the complaint commencing the case was filed in 1994.   The events underlying the complaint, of course, occurred before that time.

21

could have concluded that such was necessary and reasonable.   As
Smith indicates, the law was sufficiently clearly established in
August 1995 to inform a reasonable officer that the unnecessary
infliction of injury upon a suspect who no longer is resisting
arrest violates the Fourth Amendment.   The shield of qualified
immunity is not available to them here, so the motion for summary
judgment in behalf of Officers Harmon and Morrissette on this claim
is due to be denied.

In addition to the claimed use of excessive force, plaintiff
also asserts a claim for denial of needed medical attention in
violation of the Fourteenth Amendment.   To be entitled to prevail
on such a claim, an arrestee must show that the named defendants
were deliberately indifferent to her need for treatment of a
serious medical condition. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct.
285, 50 L.Ed.2d 251 (1976); Hamm v. DeKalb County, 774 F.2d 1567
(11th Cir., 1985) cert. denied 475 U.S. 1096, 106 S.Ct. 1492, 89
L.Ed. 2d (1986).   To be deliberately indifferent, the defendant
must be aware of the need for treatment and then either refuse or
unreasonably delay it.

In this case, plaintiff has failed to offer any proof that
Officers Harmon and Morrissette were aware of her need for medical
attention.   While she testified by affidavit that she requested

medical attention at the jail, she did not identify who it was that actually refused her request.    The court is left to speculate whether it was either of these named defendants or some other officer not joined in the suit.

The medical-treatment claim also fails simply on the undisputed facts.  While plaintiff complains that she asked to be taken to a hospital, she also admits that Hoover paramedics were called to the jail to examine her, which she refused.    It can hardly be said that the defendants (or any other officers) were deliberately indifferent to her need for medical treatment when they summoned paramedics to administer treatment she refused to accept.    The motion for summary judgment on this claim for denial of medical treatment is due to be granted as to all three defendants and this claim dismissed with prejudice.


## Conclusion

To sum up the court's conclusions, the motion for summary judgment in behalf of the City of Hoover is due to be granted on all claims and Hoover will be dismissed with prejudice.  The motion for summary judgment in behalf of Officers Harmon and Morrissette is due to be granted on all claims against them in their official capacities and on plaintiff's Fourteenth Amendment claim for denial

23

of medical treatment in their individual capacities, but denied on her Fourth Amendment claim against them in their individual capacities for use of excessive force in effecting her arrest.  A separate order will be entered.

DATED this the 25th day of March, 1999.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

24